AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Wayne Anthony Moran | ) | Case No. |
| | ) | |
| | ) | |
| | ) | 18 MJ 00735 |
| _____ | ) | |
| *Defendant(s)* | | |

FILED
CLERK, U.S. DISTRICT COURT

MAR 2 7 2018

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

# CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____November 18, 2016_____ in the county of _____Los Angeles_____ in the

_____Central_____ District of _____California_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC 545<br>18 USC 2(b) | Importing, and causing the importation of, merchandise into the United States contrary to law |

This criminal complaint is based on these facts:

See attached affidavit

☐ Continued on the attached sheet.

/s/
*Complainant's signature*

Michael Landon
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  3/27/2018

ALEXANDER F. MacKINNON
*Judge's signature*

City and state:          Los Angeles, California          Alexander F. MacKinnon, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Michael Landon, being duly sworn, declare and state as
follows:

### I.    INTRODUCTION

1.    I am employed as a special agent ("SA") with the U.S.
Food and Drug Administration ("FDA"), Office of Criminal
Investigations ("OCI"), and have been so employed since April
2016.  During this time, I have conducted and participated in
complex criminal investigations including the investigation of
misbranded and/or unapproved drugs and prescription drugs.
Prior to my employment with FDA-OCI, I was employed by the U.S.
Department of Health and Human Services, Office of Inspector
General, where I worked as a SA for approximately six years
investigating complex healthcare fraud schemes involving federal
and state health care programs.  During my career in federal law
enforcement, I have been involved in numerous investigations
where computers were used to facilitate criminal acts and search
warrants were executed to obtain evidence of criminal
violations.  I have completed training in computer-related
violations and computer technology at the Federal Law
Enforcement Training Center.

2.    I make this affidavit in support of a criminal
complaint against, and arrest warrant for, WAYNE ANTHONY MORAN
("MORAN") for a violation of 18 U.S.C. §§ 545, 2(b) (Importing,
and Causing the Importation of, Merchandise Contrary to Law).  I
further make this affidavit in support of an application for a
search warrant for information associated with the account

identified as drwaynemoran@mac.com, which includes the aliases
drwaynemoran@me.com and drwaynemoran@icloud.com, ("SUBJECT
ACCOUNT"), [1] that is stored at premises controlled by Apple Inc.,
a provider of electronic communication and remote computing
services, located at 1 Infinite Loop, Cupertino, California
95014 ("PROVIDER")[2]  The information to be searched is described
in Attachment A.   This affidavit is made in support of an
application for a search warrant under 18 U.S.C. §§ 2703(a),

---

[1] During the course of this investigation, I learned that
information associated with @mac.com email addresses includes
information related to the corresponding @me.com email addresses
and @icloud.com email addresses.   Information associated with
@mac.com, @me.com, and @icloud.com email addresses is stored in
the same location and accessed with the same credentials.
Accordingly, SUBJECT ACCOUNT includes the email addresses
drwaynemoran@mac.com, drwaynemoran@me.com, and
drwaynemoran@icloud.com.

   On May 4, 2017, the Honorable Paul L. Abrams, United States
Magistrate Judge, authorized the search and seizure of
information associated with the SUBJECT ACCOUNT for the period
of January 1, 2014, to the execution of that warrant.   The
instant application seeks information associated with the
SUBJECT ACCOUNT occurring prior to January 1, 2014, and on or
after May 20, 2017.

   [2] Because this Court has jurisdiction over the offense(s)
being investigated, it may issue the warrants to compel the
PROVIDERS pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A),
(c)(1)(A).   See 18 U.S.C. §§ 2703(a) ("A governmental entity may
require the disclosure by a provider . . . pursuant to a warrant
issued using the procedures described in the Federal Rules of
Criminal Procedure . . . by a court of competent jurisdiction")
and 2711 ("the term 'court of competent jurisdiction' includes -
- (A) any district court of the United States (including a
magistrate judge of such a court) or any United States court of
appeals that -- (i) has jurisdiction over the offense being
investigated; (ii) is in or for a district in which the provider
of a wire or electronic communication service is located or in
which the wire or electronic communications, records, or other
information are stored; or (iii) is acting on a request for
foreign assistance pursuant to section 3512 of this title").

2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[3] to require the PROVIDER

to disclose to the government copies of the information

(including the content of communications) described in Section

II of Attachment B.  Upon receipt of the information described

in Section II of Attachment B, law enforcement agents and/or

individuals assisting law enforcement and acting at their

direction will review that information to locate the items

described in Section III of Attachment B.  Attachments A and B

are incorporated herein by reference.

3.     Furthermore, as described more fully below, I

respectfully submit there is probable cause to believe that

WAYNE ANTHONY MORAN has committed the violation of 18 U.S.C.

§§ 545, 2(b) (Importing, and Causing the Importation of,

Merchandise Contrary to Law), and that the information

associated with the SUBJECT ACCOUNT constitutes evidence,

contraband, fruits, and/or instrumentalities of criminal

violations of, 18 U.S.C. § 371 (Conspiracy to Violate the Food,

Drug, and Cosmetic Act and to Defraud the United States); 21

---

[3] The government is seeking non-content records pursuant to
18 U.S.C. § 2703(d).  To obtain the basic subscriber
information, which does not contain content, the government
needs only a subpoena.  See 18 U.S.C. § 2703(c)(1), (c)(2).  To
obtain additional records and other information--but not
content--pertaining to subscribers of an electronic
communications service or remote computing service, the
government must comply with the dictates of section
2703(c)(1)(B), which requires the government to supply specific
and articulable facts showing that there are reasonable grounds
to believe that the records or other information sought are
relevant and material to an ongoing criminal investigation in
order to obtain an order pursuant to 18 U.S.C. § 2703(d).  The
requested warrants call for both records containing content (see
Attachment B paragraph II.10.a.) as well as subscriber records
and other records and information that do not contain content
(see Attachments B paragraph II.10.b.).

U.S.C. §§ 331(a), 333(a)(1), (a)(2) (Introduction or Causing the Introduction of a Misbranded Drug into Interstate Commerce); 21 U.S.C. §§ 331(d), 355(a), 333(a)(1), (a)(2) (Introduction or Causing the Introduction of an Unapproved New Drug into Interstate Commerce); and 18 U.S.C. § 545 (Importing Merchandise Contrary to Law); 18 U.S.C. § 2(b) (Causing an Act to Be Done).

4.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and/or information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.  FEDERAL FOOD, DRUG, AND COSMETIC ACT

5.     The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq. ("FDCA"), regulates the manufacture, labeling, and distribution of all drugs shipped or received in interstate commerce, including the distribution of prescription drugs.

6.     A "drug" is defined by the FDCA as, among other things, articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; articles (other than food) intended to affect the structure or any function of the body of man or other animals;

4

and articles intended for use as a component of any such articles.   21 U.S.C. § 321(g)(1)(B), (C), (D).

7.   A "new drug" is defined by the FDCA as "any drug . . . the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof . . . ."   21 U.S.C. § 321(p)(1).

8.   Under the FDCA, drugs that may only be dispensed upon a written prescription of a licensed practitioner (i.e., prescription drugs) include any "drug intended for use by man which because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe except under the supervision of a practitioner licensed by law to administer such drug."   21 U.S.C. § 353(b)(1)(A).   A drug may also be limited to prescription use by its FDA-approved application.   See 21 U.S.C. § 353(b)(1)(B).

9.   Under the FDCA, a "new drug" may not be introduced or delivered for introduction into interstate commerce unless FDA has approved a New Drug Application ("NDA") or an Abbreviated New Drug Application[4] ("ANDA") with respect to the drug, or it qualifies for an exemption as an Investigational New Drug.[5]   21 U.S.C. §§ 355(a), 331(d).   The manufacturer of the new drug is

---

[4] Typically used for generics of existing, approved drugs.
[5] Typically used for clinical trials.

required to submit information in the NDA or ANDA showing to FDA's satisfaction that its new drug is safe and effective for its intended use.  21 U.S.C. §§ 355(b)(1), (j), (l); 21 C.F.R. § 314.50.

10.   The FDCA establishes that a drug is deemed to be "misbranded" if it does not meet certain requirements of the statute, including, among other things: (1) if its labeling is false or misleading in any particular, 21 U.S.C. § 352(a); (2) if in a package form unless it bears a label containing the name and place of business of the manufacturer, packer, or distributor, 21 U.S.C. § 352(b); (3) if its labeling fails to bear adequate directions for use, 21 U.S.C. § 352(f); or (4) if, among other things, a drug came from a foreign drug establishment and the drug was not annually listed with the FDA by that establishment as one of the drugs which was being manufactured for commercial distribution in the United States, 21 U.S.C. §§ 352(o), 360(i), 360(j).  In the case of a prescription drug, a drug is also misbranded if its label fails to bear the symbol "Rx only."  21 U.S.C. § 353(b)(4)(A); 21 C.F.R. § 201.100(b)(1).

11.   The FDCA prohibits the introduction, or causing the introduction, of misbranded drugs and unapproved new drugs into interstate commerce.  21 U.S.C. §§ 331(a), (d), 355(a).  The term "interstate commerce" includes "commerce between any State or Territory and any place outside thereof."  21 U.S.C. § 321(b).

12.   A violation of § 331(a) or (d) constitutes a strict liability Class A misdemeanor.  See 21 U.S.C. § 333(a)(1). However, a violation of § 331(a) or (d) committed with the intent to defraud or mislead constitutes a felony.  See 21 U.S.C. § 333(a)(2).

### III. SUMMARY OF INVESTIGATION

13.   The FDA-OCI is currently investigating the introduction into interstate commerce of pellets that purport to contain the active pharmaceutical ingredient ("API") naltrexone, a prescription drug used to treat alcohol and opioid dependence. The naltrexone pellet is surgically inserted into a patient so it can dissolve and release the API over a specified time period.

14.   An online purchase of these pellets – facilitated by corresponding with the SUBJECT ACCOUNT and info@implantworks.org (the "ImplantWorks account") – resulted in the importation and false declaration of pellets containing naltrexone in different dosage amounts from Hong Kong to the United States.  The parcel containing the naltrexone pellets bore a label that misstated the contents of the package as plastic beads in plastic tubes.

15.   Inside the parcel, the packaging of the naltrexone pellets lacked a drug manufacturer's name and was not labeled "Rx Only" as required by the FDCA.  Moreover, the pellets lacked instructions on how to administer the drugs to patients safely.

16.   The foreign sourced naltrexone pellets have been evaluated by the FDA's Center for Drug Evaluation and Research

and have been determined to constitute a drug, a prescription drug, a new drug, and an unapproved new drug under the FDCA.

17.   On May 4, 2017, the Honorable Paul L. Abrams, U.S. Magistrate Judge, authorized the search and seizure of information associated with the SUBJECT ACCOUNT and info@implantworks.org for the period of January 1, 2014, to the execution of the warrants.  The information associated with the SUBJECT ACCOUNT provided by the PROVIDER included, among other things, emails up to May 20, 2017.  A review of emails seized pursuant to the prior search warrant for the SUBJECT ACCOUNT revealed, among other things, the following:

   a.   MORAN procured pellets containing 800 milligrams and 500 milligrams of naltrexone from Dr. Lance Gooberman, located in New Jersey, and Susan Tickner, an individual who appears to be employed by Dr. Gooberman.

   b.   Dr. Gooberman was aware that the naltrexone pellets were not FDA-approved when he provided them to MORAN.

   c.   Dr. Gooberman referred U.S.-based customers to MORAN to purchase and import the naltrexone pellets.

   d.   MORAN, with the assistance of United Mailorder Ltd., a company based in Hong Kong, sent naltrexone pellets to U.S.-based customers using a description of goods that mischaracterized the contents of the packages as "plastic beads in plastic tubes" and similar descriptions.

   e.   MORAN paid Dr. Gooberman for any 800 milligram and 500 milligram naltrexone pellets that MORAN sold.

f.   MORAN used the SUBJECT ACCOUNT to communicate with Dr. Gooberman and with Ms. Tickner, and to coordinate the procurement of and the payment for naltrexone pellets.

### IV.   STATEMENT OF PROBABLE CAUSE

18.   On September 20, 2016, I received a phone call from Tom Welch, Vice President of Operations of BioCorRx, a company that offers an alcohol and opioid addiction recovery program across the United States.   BioCorRx's addiction recovery program includes the use of surgically implantable naltrexone pellets ("naltrexone pellet(s)" or "pellet(s)").[6]   According to Mr. Welch, after the naltrexone pellet is surgically implanted in a patient's abdomen, it will dissolve over approximately three to six months, during which time the patient's cravings for alcohol or opioids are reduced or eliminated.

19.   Mr. Welch further stated that he recently learned about a "black market" naltrexone pellet that was allegedly being manufactured in Hong Kong and sold to physicians in the United States by MORAN.   Mr. Welch told me that BioCorRx's physician clients were being solicited by sales representatives of MORAN and offered the Hong Kong naltrexone pellet.

_____

[6] During the course of this investigation, including my review of the records and emails previously obtained for the SUBJECT ACCOUNT and the ImplantWorks account, I have learned that implantable naltrexone pellets may be referred to by several different names, including, among others, "naltrexone pellets," "pellets," "naltrexone implants," "implants," "NTX 500 mg," and "NTX 800 mg."   For purposes of this affidavit, I refer to the product as "naltrexone pellets" or "pellets," except where specific language is excerpted from an email or other source.

20. Later, on September 20, 2016, Mr. Welch emailed me a photograph depicting an email that he said he received from a physician client of BioCorRx who was solicited by MORAN. Although the photograph did not reveal the email address of the sender or recipient, Mr. Welch stated that the email address of the sender was the SUBJECT ACCOUNT. Upon reading the email, I saw that the foreign naltrexone pellets were being offered and that the signature at the bottom of the email was as follows:

> Dr. Wayne Moran M.B., B.S.
> MediXO
> 25 Shum Wan Rd,
> Aberdeen,
> Hong Kong
> Tel: +852 94887720
> Fax: +852 30105801

21. On October 18, 2016, Mr. Welch contacted me and provided me with the contact information for Dr. Stuart Finkelstein, a medical doctor specializing in addiction treatment. Mr. Welch stated that Dr. Finkelstein had communicated with MORAN regarding naltrexone pellets.

22. On October 20, 2016, FDA-OCI SA Robert Iwanicki and I interviewed Dr. Finkelstein and his office manager, Sally Morales. Dr. Finkelstein stated that, in or around 2014, a physician colleague told him that he could procure naltrexone pellets from MORAN and provided Dr. Finkelstein with MORAN's contact information. The contact information included the SUBJECT ACCOUNT.

23. Both Dr. Finkelstein and Ms. Morales agreed to cooperate with the government and consented to send email

messages, as directed by FDA-OCI agents, from Ms. Morales's email account (hereinafter, the "Morales account") to MORAN at the SUBJECT ACCOUNT and the ImplantWorks account. Through the investigation, I learned that the ImplantWorks account was associated with the website www.implantworks.org, a website that offered for sale "Naltrexone Implants" and appeared to be operated by MORAN.[7]

24. On November 1, 2016, Ms. Morales, acting at my direction, sent an email from the Morales account to the SUBJECT ACCOUNT requesting to purchase naltrexone pellets. On November 2, 2016, an email response with an attached order form was received by the Morales account from the SUBJECT ACCOUNT. The email stated, "Please find attached price list in Hong Kong Dollars with full details of volume discounts, payment and delivery options. When you are ready to order please email me with full details of exact order quantity and dose, contact name, address with zip code, telephone and email contact for courier delivery." The signature at the bottom of the email was as follows:

---

[7] On March 20, 2018, I reviewed the website www.implantworks.org. The website offered naltrexone pellets for sale and provided MORAN's telephone number (i.e., +852 94887720) and the ImplantWorks account as the contact information. On November 23, 2016, I received information from LegitScript, an FDA-OCI contractor, that indicated the website www.implantworks.org was created April 16, 2010, and appeared to be operated by MORAN. LegitScript also provided a screen capture of the website as of November 9, 2016. The website looked different on November 9, 2016, from how it looked on March 20, 2018. The November 9, 2016, screen capture contained information about "Naltrexone Implants," including the effects of naltrexone, and reflected the ImplantWorks account as the only contact information.

Dr. Wayne Moran M.B., B.S.
25 Shum Wan Rd,
Aberdeen,
Hong Kong
Tel: +852 94887720
Fax: +852 30105801
drwaynemoran@mac.com

25.  I reviewed the attached price list and observed the
following instructions: "Sign and return by email to
info@implantworks.org . . . ."

26.  On November 16, 2016, Ms. Morales, acting at my
direction, sent an email from the Morales account to the SUBJECT
ACCOUNT and the ImplantWorks account, attaching a completed
order form.  The order requested one unit of "Naltrexone implant
500 mg," two units of "Naltrexone implant 800 mg," two units of
"Naltrexone implant 2200 mg," and two units of "Naltrexone
implant 1800 mg."  The total projected cost of the order was
$3,375.15.  The body of the email stated the following: "Do we
have to do anything on our end to clear it [parcel containing
naltrexone pellets] through customs?"

27.  Later, on November 16, 2016, the Morales account
received an email response from the ImplantWorks account, which
was forwarded to me.  The body of the email stated the
following: "The credit card has cleared so your order will be
shipped today.  There should be no problem with custom clearance
in USA.  Stock of NTX 2200 mg is only 1 and currently we do not
intend to reorder.  Sorry I did not take a close look at the
order when you sent it.  In this case I will send you an

additional NTX 1800 mg.  I hope this is OK.  Thanks Wayne."  The
signature at the bottom of the email was as follows:

> Dr. Wayne Moran
> info@implantworks.org
> 25 Shum Wan Rd,
> Aberdeen,
> Hong Kong
> Tel: +852 94887720
> Fax: +852 30105801
> drwaynemoran@mac.com

28.  On November 17, 2016, Ms. Morales provided me with a
copy of a confirmation email for the order placed on November
16, 2016.  The confirmation email contained shipping information
for the parcel, including a DHL tracking number.  Using the DHL
tracking number, I was able to determine the transit status of
the parcel and that it was scheduled to be delivered to Dr.
Finkelstein's office on November 18, 2016.

29.  On November 18, 2016, I waited in Dr. Finkelstein's
office until the parcel was delivered by DHL.  After the parcel
was delivered to and signed for by an employee working at the
front desk of Dr. Finkelstein's office, the parcel was provided
to me.

30.  When I examined the parcel, I noticed that the label
affixed to the parcel reflected the following sender: "UMO, Ms.
Liu, Unit 1617, Tuen Mun Central Square, 22 Hoi Wing Road, Tuen
Mun, Hong Kong."  An online records check of facilities
registered with the FDA to manufacture drugs for distribution in
the United States failed to return a listing for "UMO" or any
facility associated with the aforementioned address.

31.   I further observed that the contents of the parcel were listed as "Plastic beads in plastic tubes x 7 pcs."   I opened the parcel and observed seven sealed packages, all of which were labeled "Naltrexone" in different doses.[8]   None of the packages were labeled "Rx Only" or bore a manufacturer's name. In addition, the packages either contained no instructions for use or, at best, minimal and inadequate instructions for use.   I also observed a paper labeled "Commercial Invoice."   The invoice included a "Description" of "Plastic Beads in Plastic Tubes" and an "Amount" of "$21.00."

32.   On November 22, 2016, I sent all seven sealed packages that I received on November 18, 2016, to the FDA Forensic Chemistry Center for laboratory testing.   On April 28, 2017, I spoke to Tom Brueggemeyer, Supervisory Chemist for the FDA Forensic Chemistry Center, who provided preliminary results of the laboratory testing.   According to Mr. Brueggemeyer, laboratory testing confirmed that the contents of the packages contained naltrexone.[9]

---

[8] Of the seven packages, there appeared to be four distinct prescription drug products based on the labels affixed to the packages.   While all four of the product labels indicated the presence of naltrexone, three of the product labels also indicated the presence of an additional ingredient, triamcinolone.

[9] In addition to naltrexone, samples from two of the packages that reflected the presence of triamcinolone tested positive for the presence of a triamcinolone derivative, which, according to Mr. Brueggemeyer, is a separate and distinct drug molecule from triamcinolone.   Laboratory testing of a third sample that came from a package reflecting the presence of triamcinolone did not confirm the presence of triamcinolone or any derivative thereof.

33.  On May 5, 2017, I served the search warrants authorized by the Honorable Paul L. Abrams on May 4, 2017, on the PROVIDER for the SUBJECT ACCOUNT and on Bluehost Inc., a provider of electronic communication and computing services, for the ImplantWorks account.

34.  On May 17, 2017, I received documents and a DVD containing information associated with the ImplantWorks account from Bluehost.com, in response to the search warrant served on May 5, 2017.

35.  On July 7, 2017, FDA Seized Computer Evidence Recovery Specialist ("SCERS") SA Cindy Niu provided me access to the information associated with the SUBJECT ACCOUNT that she had received from the provider, in response to the search warrant served on May 5, 2017.[10]  Although the search warrant compelled the PROVIDER to provide emails that occurred on or after January 1, 2014, the PROVIDER provided a USB drive that contained all emails associated with the SUBJECT ACCOUNT, including emails occurring before January 1, 2014.  After it was discovered that the additional emails had been included, SCERS SA Niu and I segregated emails with sent and/or received dates prior to January 1, 2014, and removed them from my final review set.  I

_____

[10] On March 14, 2018, the Honorable Alka Sagar, U.S. Magistrate Judge, authorized the search and seizure of information associated with the accounts lgooberman@mac.com, including lgooberman@me.com and lgooberman@icloud.com (the "Gooberman account"), and suetic@aol.com (the "Tickner account").  The affidavit in support of the application for those search warrants contained a typographical error, stating that SCERS SA Niu provided me access to the information on June 7, 2017.  In fact, SA Niu first made the information available to me on July 7, 2017.

do not recall reviewing – and am unaware of – the contents of
any emails with a sent and/or received date occurring before
January 1, 2014, except those that were attached as part of an
email chain to an email occurring on or after January 1, 2014.
The USB drive received from the PROVIDER was placed into a
sealed evidence bag and entered into the FDA-OCI's evidence
inventory.

36.   On August 28, 2017, I received documents from DHL
related to the sender of the parcel received by Dr.
Finkelstein's office on November 18, 2016, namely, "UMO, Ms.
Lin, Unit 1617, Tuen Mun Central Square, 22 Hoi Wing Road, Tuen
Mun, Hong Kong." Based on my review of the records, I learned
that the name on the sender's account was UNITED MAILORDER LTD,
with an address of record of Unit 1611-12 Tuen Mun Central Sq,
22 Hoi Wing Rd, Tuen Mun NT Hong Kong ("UMO"). I also learned
that from approximately January 16, 2014, to July 10, 2017, over
one hundred parcels shipped from UMO to customers in the U.S.
had declared the description of goods as "Plastic Beads in
Plastic Tubes," "Plastic Balls in Plastic Tubes," or a similar
description. The declared value of the shipped goods ranged in
amount from approximately $10 to $100.[11]

---

[11] Based on my review of emails obtained from the MORAN
account and ImplantWorks invoices attached to those emails, I
learned that, from 2014 to 2017, MORAN charged customers 1,200
Hong Kong Dollars for each 500 mg naltrexone pellet and 1,800
Hong Kong Dollars for each 800 mg naltrexone pellet.   I also
learned that MORAN sold pellets containing naltrexone in higher
dosages for even higher prices per pellet, including one pellet
that cost 7,000 Hong Kong Dollars per pellet.  Over the same
time period, MORAN used a currency exchange rate of

37.   On November 21, 2016, I received a compact disc from Karen Nicoletti, an employee of LegitScript, that contained saved images of the domain name www.pellettechnologies.com and related registrant information.   The registrant name associated with the domain was Lance Gooberman.   On March 12, 2018, I visited the website www.pellettechnologies.com and reviewed the content on the website.   I compared the information provided by Ms. Nicoletti with the information I saw on the website on March 12, 2018, and noted that the content was substantially the same. Among other things, my review of the information revealed the following:

a.   The homepage, titled "Lance Gooberman's Pellet Technologies," stated that, in the United States, Dr. Gooberman "makes and uses Gooberman Naltrexone Implants . . . at his office only for his patients at the clinic in New Jersey."   The homepage also indicated that Gooberman Naltrexone Implants were available outside of the United States from, among others, MORAN.   The contact information provided for MORAN matched the contact information contained in MORAN's signature block of his emails, plus included a mobile number.

b.   The homepage described two types of naltrexone pellets: "500 mg Gooberman Naltrexone Implants" and "800 mg Gooberman Naltrexone Implants."

---

approximately 7.5 Hong Hong Dollars to 1 United States Dollar; however, the exact exchange rates varied with different orders. Therefore, depending on the type of naltrexone pellet ordered, MORAN appeared to be charging between approximately $160 to $933 per pellet.   Based on my review of the ImplantWorks invoices, customers frequently received multiple naltrexone pellets in a single order.

c.   The "Contact Us" page directed people to contact "Susan Tickner, Manager" for more information regarding Gooberman Implants or Pellet Technologies and provided the email address info@pellettechnologies.com.

38.   From approximately August 2017 to February 2018, I reviewed emails seized from the SUBJECT ACCOUNT and the ImplantWorks account, pursuant to the May 4, 2017, search warrants.

39.   Based on my review of the emails, I concluded that Dr. Gooberman and MORAN were aware that naltrexone pellets were not FDA-approved and, therefore, Dr. Gooberman referred potential buyers to contact foreign sellers, such as MORAN, to obtain naltrexone pellets.

a.   In an email dated June 11, 2014,[12] from lgooberman@mac.com (the "Gooberman account") to rosh1zn@hotmail.com, Dr. Gooberman indicated that he invented the naltrexone pellets approximately 20 years earlier but noted that "Since they do not have FDA approval, I am precluded from making ane [sic] claims regarding safety or efficacy . . . ." The SUBJECT ACCOUNT was copied on Dr. Gooberman's email.

b.   In an email dated August 25, 2015, from lgooberman@me.com to andrew@mymedipharm.com, Dr. Gooberman stated that his naltrexone pellets had not "gone through the FDA

---

[12] Because Hong Kong is located in a different time zone from New Jersey, sent dates and received dates on the emails may be different, depending on which email account's date and time stamp is consulted. Accordingly, the email dates stated in this affidavit are approximate and attempt to reflect the date in the location where the email originated.

approval process yet," but stated that they could be obtained
from his "licensees in Hong Kong." Dr. Gooberman stated that he
would forward the customer's inquiry to MORAN and provided
MORAN's phone number. Dr. Gooberman's contact information
provided at the bottom of the email included, among other
things, the Gooberman account. The SUBJECT ACCOUNT and Ms.
Tickner's email address, suetic@aol.com (the "Tickner account")
were copied on the email.

40. Based on my review of the emails seized from the
SUBJECT ACCOUNT and the ImplantWorks account, I learned that
MORAN obtained naltrexone pellets from Dr. Gooberman and/or Ms.
Tickner to sell to customers.

a. To request naltrexone pellets, MORAN would send
an email from the SUBJECT ACCOUNT to the Gooberman account and
the Tickner account requesting "NTX 800 mg" and/or "NTX 500 mg."
Based on my review of the emails and other records in this case,
I understood that "NTX 800 mg" and "NTX 500 mg" referred to Dr.
Gooberman's naltrexone pellets containing 800 milligrams of
naltrexone and 500 milligrams of naltrexone, respectively.

b. Generally, after receiving MORAN's email, Ms.
Tickner, using the Tickner account, would correspond with MORAN,
using the SUBJECT ACCOUNT, to agree on the number of naltrexone
pellets that could be provided to MORAN and to arrange the
method of delivery. The emails suggested that MORAN would
either travel to the United States to pick up the pellets
himself or would have the pellets shipped to his daughter, Freya

Moran,[13] in Pennsylvania, who in turn, would ship the pellets to
MORAN.  Occasionally, Ms. Tickner would follow-up with MORAN by
email to provide tracking information of naltrexone pellets
shipped to Freya Moran or to confirm delivery of the naltrexone
pellets.

       c.    The emails suggested that MORAN only paid for the
naltrexone pellets received from Dr. Gooberman and/or Ms.
Tickner after the pellets were sold to customers.  Based on my
review of the emails, I learned that several times a year,
MORAN, using the SUBJECT ACCOUNT, corresponded with Dr.
Gooberman and/or Ms. Tickner to arrange payment for naltrexone
pellets sold to customers.  The emails showed that MORAN
provided an accounting of the naltrexone pellets, among other
products, that he sold over a given time period, and the
corresponding amount of money that his credit card should be
charged for the products sold.

       d.    The emails also revealed that Ms. Tickner would
periodically send a document to MORAN at the SUBJECT ACCOUNT
that reflected a cumulative accounting of products sent and
charged to MORAN.  The earliest entry on the document dated back
to May 2008 and reflected "500-Ntx 3 month."  Based on my
investigation and review of records in this case, I understood
that entry referred to a shipment of naltrexone pellets

---

[13] On March 7, 2018, I conducted a search in the TLO
database for Freya Moran in the State of Pennsylvania.  Based on
my search, it appears that Freya Moran may also be known as
Freya Saxon.

containing 500 milligrams of naltrexone to MORAN in or around
May 2008.

41. Based on my review of the emails seized from SUBJECT
ACCOUNT and the ImplantWorks account, I learned that Dr.
Gooberman, Ms. Tickner, and MORAN collaborated and corresponded
by email to fulfill U.S.-based customers' initial orders for
naltrexone pellets. After the initial order, customers
generally contacted MORAN directly for any subsequent orders.

a. Emails seized from the SUBJECT ACCOUNT and the
ImplantWorks account revealed that initial customer inquiries
and/or order requests may have been submitted to one of several
different email addresses, but, ultimately, the orders were
received and/or discussed by Dr. Gooberman and MORAN using the
SUBJECT ACCOUNT.

b. Often, initial customer orders for naltrexone
pellets were submitted to info@pellettechnologies.com, which in
turn, were forwarded to Ms. Tickner at the Tickner account. Ms.
Tickner then forwarded the emails containing the orders and/or
inquiries to the Gooberman account, who forwarded them to the
SUBJECT ACCOUNT. In other instances, customer orders and/or
inquiries were received directly by Dr. Gooberman, who forwarded
the orders to the SUBJECT ACOUNT.

c. After the orders were received by MORAN, MORAN
used the SUBJECT ACCOUNT to communicate with the customers who
placed the orders and to forward the orders to representatives
at UMO to fulfill the orders.

d.    Representatives at UMO would respond to the SUBJECT ACCOUNT to confirm receipt or clarify the orders.

e.    After fulfilling and shipping the orders, a representative at UMO would email the customers, copying the SUBJECT ACCOUNT, to provide confirmation of shipment and courier tracking numbers.

f.    Based on the information provided in the confirmation emails sent by UMO to customers, I was able to identify the corresponding courier tracking records (e.g., DHL and FedEx records).  The tracking numbers and addressees on the courier tracking records matched the information provided in the emails sent by UMO.  Moreover, the contents of the packages were described as "plastic beads in plastic tubes" or a similar variation.

42.   Based on my review of the emails seized from the SUBJECT ACCOUNT and the ImplantWorks account, I learned that MORAN knows that naltrexone pellets were being shipped under the description of "plastic beads in plastic tubes."

a.    In an email dated February 17, 2014, from the SUBJECT ACCOUNT to cymie.cheng@umo.hk, MORAN instructed a representative of UMO to send naltrexone pellets to a customer in South Africa using DHL and suggested that the order be described as "plastic beads in plastic tubes."

b.    In an email dated September 23, 2015, from the SUBJECT ACCOUNT to dmarkel@myliferecoverycenters.com, MORAN provided instructions on how a customer in the United States

could return unused naltrexone pellets to MORAN in Hong Kong.[14]
MORAN instructed the customer to send the pellets by FedEx,
adding, "Please send as 'plastic beads in plastic tubes –
cosmetic jewellery' It is problematic to send medications."

43.   Between December 8, 2016, and January 15, 2018,
Michael Cummins, Senior Operations Manager, FDA-OCI, and I sent
Dr. Arthur Simone, Senior Medical Advisor for the FDA's Office
of Unapproved Drugs and Labeling Compliance, information
obtained during the investigation regarding the naltrexone
pellets.   Dr. Simone was asked to evaluate whether the
naltrexone pellets constituted a drug, a prescription drug, a
new drug, and/or an unapproved new drug under the FDCA.   Among
other things, Dr. Simone received: photographs of the shipping
label affixed to the parcel delivered to Dr. Finkelstein's
office on November 18, 2016, and the packages contained inside
the parcel, a screen capture of the website
www.implantworks.org, which was associated with the ImplantWorks
account, laboratory reports containing test results for the
naltrexone pellets received on November 18, 2016, selected
emails from the SUBJECT ACCOUNT and the ImplantWorks account,
and names of individuals and companies believed to be associated
with manufacturing, labeling, selling, and distributing the
naltrexone pellets.   As part of his evaluation, Dr. Simone also
reviewed the website www.pellettechnologies.com.

---

[14] The naltrexone pellets intended to be returned do not
appear to be Dr. Gooberman's naltrexone pellets.   Based on my
investigation and review of records in this case, it is my
understanding that the naltrexone pellets that the customer
sought to return were manufactured in Australia.

44.   On February 21, 2018, I received an email from Dr.
Simone with an attached draft memorandum that contained his
conclusions about the naltrexone pellets.   The draft memorandum
concluded, in summary, that pellets containing naltrexone
intended for use in the management of alcohol or opioid
dependence would be classified as a drug, a prescription drug, a
new drug, and an unapproved new drug.   In addition, Dr. Simone
confirmed in his email that products containing naltrexone and
triamcinolone would also be classified as drugs, prescription
drugs, new drugs, and unapproved new drugs.

45.   On March 7, 2018, I reviewed information on Apple's
website concerning @mac.com, @me.com, and @icloud.com email
addresses.   Based on that review, I learned that @mac.com,
@me.com, and @icloud.com email addresses with the same username
are aliases of each other and that the contents are all stored
in the same iCloud account.   The same day, I also participated
in a call with Roslyn Quinn, Privacy and Law Enforcement
Compliance, Apple, Inc.   Ms. Quinn confirmed that information
associated with a particular username for an @mac.com email
address includes emails for the same username for an @me.com
email address.   Ms. Quinn also confirmed that the @mac.com and
@me.com emails for the same username are aliases and that emails
sent to one account could be accessed by the other.

46.   On March 26, 2018, I sent the PROVIDER a preservation
letter requesting that information associated with the SUBJECT
ACCOUNT be preserved for 90 days pursuant to 18 U.S.C. 2703(f).

47.   Other than what has been described herein, to my knowledge the United States has not attempted to obtain the contents of the SUBJECT ACCOUNT by other means.

## V.   BACKGROUND ON E-MAIL AND SOCIAL MEDIA ACCOUNTS AND THE PROVIDER

48.   In my training and experience, I have learned that providers of e-mail and/or social media services offer a variety of online services to the public.   Providers, like the PROVIDER, allow subscribers to obtain accounts like the SUBJECT ACCOUNT. Subscribers obtain an account by registering with the provider. During the registration process, providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail or social media account.   Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).   Some providers also maintain a record of changes that are made to the information provided in subscriber records, such as to any other e-mail addresses or phone numbers supplied in subscriber records.   In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of an account.

49.   Therefore, the computers of the PROVIDER are likely to contain stored electronic communications and information concerning subscribers and their use of the PROVIDER'S services,

such as account access information, e-mail or message
transaction information, and account application information.
In my training and experience, such information may constitute
evidence of the crimes under investigation because the
information can be used to identify the user(s) of a SUBJECT
ACCOUNT.

50.   In my training and experience, e-mail and social media
providers typically retain certain transactional information
about the creation and use of each account on their systems.
This information can include the date on which the account was
created, the length of service, records of login (i.e., session)
times and durations, the types of service utilized, the status
of the account (including whether the account is inactive or
closed), the methods used to connect to the account (such as
logging into the account via the provider's website), and other
log files that reflect usage of the account.  In addition, e-
mail and social media providers often have records of the
Internet Protocol ("IP") address used to register the account
and the IP addresses associated with particular logins to the
account.  Because every device that connects to the Internet
must use an IP address, IP address information can help to
identify which computers or other devices were used to access a
SUBJECT ACCOUNT.

51.   In my training and experience, e-mail and social media
account users will sometimes communicate directly with the
service provider about issues relating to the account, such as
technical problems, billing inquiries, or complaints from other

users.  Providers of e-mails and social media services typically
retain records about such communications, including records of
contacts between the user and the provider's support services,
as well records of any actions taken by the provider or user as
a result of the communications.  In my training and experience,
such information may constitute evidence of the crimes under
investigation because the information can be used to identify
the user(s) of a SUBJECT ACCOUNT.

52.  I know from my training and experience that the
complete contents of an account may be important to establishing
the actual user who has dominion and control of that account at
a given time.  Accounts may be registered in false names or
screen names from anywhere in the world with little to no
verification by the service provider.  They may also be used by
multiple people.  Given the ease with which accounts may be
created under aliases, and the rarity with which law enforcement
has eyewitness testimony about a defendant's use of an account,
investigators often have to rely on circumstantial evidence to
show that an individual was the actual user of a particular
account.  Only by piecing together information contained in the
contents of an account may an investigator establish who the
actual user of an account was.  Often those pieces will come
from a time period before the account was used in the criminal
activity.  Limiting the scope of the search would, in some
instances, prevent the government from identifying the true user
of the account and, in other instances, may not provide a
defendant with sufficient information to identify other users of

the account. Therefore, the contents of a given account, including the e-mail addresses or account identifiers and messages sent to that account, often provides important evidence regarding the actual user's dominion and control of that account. For the purpose of searching for content demonstrating the actual user(s) of a SUBJECT ACCOUNT, I am requesting a warrant requiring the PROVIDER to turn over all information associated with a SUBJECT ACCOUNT with the date restrictions included in Attachments B for review by the search team.

53. Relatedly, the government must be allowed to determine whether other individuals had access to a SUBJECT ACCOUNT. If the government were constrained to review only a small subsection of an account, that small subsection might give the misleading impression that only a single user had access to the account.

54. I also know based on my training and experience that criminals discussing their criminal activity may use slang, short forms (abbreviated words or phrases such as "lol" to express "laugh out loud"), or code words (which require entire strings or series of conversations to determine their true meaning) when discussing their crimes. They can also discuss aspects of the crime without specifically mentioning the crime involved. In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of a message or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon

and parenthesis :) to convey a smile or agreement) to discuss
matters. "Keyword searches" would not account for any of these
possibilities, so actual review of the contents of an account by
law enforcement personnel with information regarding the
identified criminal activity, subject to the search procedures
set forth in Attachment B is necessary to find all relevant
evidence within the account.

55.   This application seeks a warrant to search all
responsive records and information under the control of the
PROVIDER, which is subject to the jurisdiction of this court,
regardless of where the PROVIDER has chosen to store such
information.

56.   As set forth in Attachment B, I am requesting a
warrant that permits the search team to keep the original
production from the PROVIDER, under seal, until the
investigation is completed and, if a case is brought, that case
is completed through disposition, trial, appeal, or collateral
proceeding.

a.   I make that request because I believe it might be
impossible for a provider to authenticate information taken from
a SUBJECT ACCOUNT as its business record without the original
production to examine. Even if the provider kept an original
copy at the time of production (against which it could compare
against the results of the search at the time of trial), the
government cannot compel the provider to keep a copy for the
entire pendency of the investigation and/or case. If the
original production is destroyed, it may be impossible for the

provider to examine a particular document found by the search team and confirm that it was a business record of the provider taken from a SUBJECT ACCOUNT.

b.    I also know from my training and experience that many accounts are purged as part of the ordinary course of business by providers.  For example, if an account is not accessed within a specified time period, it -- and its contents -- may be deleted.  As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example, if a defendant is incarcerated and does not (perhaps cannot) access his or her account.  Preserving evidence, therefore, would ensure that the government can satisfy its Brady obligations and give the defendant access to evidence that might be used in his or her defense.

## VI.    REQUEST FOR NON-DISCLOSURE

57.    Pursuant to 18 U.S.C. § 2705(b), I request that the Court enter an order commanding the PROVIDER not to notify any person, including the subscriber(s) of the SUBJECT ACCOUNT, of the existence of the warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the PROVIDER complies with the warrant or such later date as may be set by the Court upon application for an extension by the United States.  There is reason to believe that such notification will result in (1) flight from prosecution; (2) destruction of or tampering with evidence;

(3) intimidation of potential witnesses; and (4) otherwise seriously jeopardizing the investigation. The current investigation set forth above is not public, and I know, based on my training and experience, that individuals engaged in criminal activity may attempt to mask their activity and jeopardize the investigation. In addition, if the PROVIDER or other persons notify the targets of the investigation that warrants have been issued for the SUBJECT ACCOUNT, the targets may attempt to delete computer evidence.

### VII. CONCLUSION

58. Based on the foregoing, I request that the Court issue the requested warrants and submit that there is probable cause to believe that MORAN has committed a violation of 18 U.S.C. §§ 545, 2(b) (Importing, and Causing the Importation of, Merchandise Contrary to Law).

/s/
_____
Michael Landon, Special Agent
U.S. Food and Drug
Administration, Office of
Criminal Investigations

Subscribed to and sworn before me
on MARCH 27, 2018.

ALEXANDER F. MacKINNON
_____
HONORABLE ALEXANDER F. MACKINNON
UNITED STATES MAGISTRATE JUDGE

31

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

This warrant applies to information associated with the account identified as drwaynemoran@mac.com, which includes the aliases drwaynemoran@me.com and drwaynemoran@icloud.com, (the "SUBJECT ACCOUNT") that is within the possession, custody, or control of Apple, Inc., a company that accepts service of legal process at Apple Inc., Attention: Privacy and Law Enforcement Compliance, 1 Infinite Loop, Cupertino, California 95014 or via e-mail at Subpoenas@Apple.com, regardless of where such information is stored, held, or maintained.

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

## I.  SEARCH PROCEDURE

1.  The warrant will be presented to personnel of Apple Inc. (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2.  To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.  The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

4.  With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.10.a. below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant.  The search shall extract and seize only the specific items to be seized under this warrant (see Section III below).  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

i

5. If the search team encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

6. The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from the PROVIDER of the response to this warrant. The government will not search the content records beyond this 120-day period without first obtaining an extension of time order from the Court.

7. Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the Court. Thereafter, the search team will not access the data from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8. The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9. Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

## II. INFORMATION TO BE DISCLOSED BY THE PROVIDER

10. To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each SUBJECT ACCOUNT listed in Attachment A:

a. All contents of all wire and electronic communications associated with the SUBJECT ACCOUNT, limited to that which occurred from January 1, 2008, to January 1, 2014, and which occurred on or after May 20, 2017,[15] including:

i. All e-mails, communications, or messages of any kind associated with the SUBJECT ACCOUNT, including stored or preserved copies of messages sent to and from the account, deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each e-mail or message, and any related documents or attachments.

ii. All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken.

---

[15] To the extent it is not reasonably feasible for the PROVIDER to restrict any categories of records based on this date restriction (for example, because a date filter is not available for such data), the PROVIDER shall disclose those records in its possession at the time the warrant is served upon it.

      b.   All other records and information, including:

         i.   All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), any alternate name(s), other account names or e-mail addresses associated with the account, linked accounts, telephone numbers, physical addresses, and other identifying information regarding the subscriber, including any removed or changed names, email addresses, telephone numbers or physical addresses, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment, including detailed billing records, **and including any changes made to any subscriber information** or services, including specifically changes made to secondary e-mail accounts, phone numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the following accounts:

         (I)   the SUBJECT ACCOUNT

        ii.   All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNT described above in Section II.10.a., including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations.

### III.  INFORMATION TO BE SEIZED BY THE GOVERNMENT

11.  For each SUBJECT ACCOUNT listed in Attachment A, the search team may seize:

a.  All information described above in Section II.10.a. that constitutes evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 371 (Conspiracy to violate the Food, Drug, and Cosmetic Act and to Defraud the United States); 21 U.S.C. §§ 331(a), 333(a)(1), (a)(2) (Introduction or Causing the Introduction of a Misbranded Drug into Interstate Commerce); 21 U.S.C. §§ 331(d), 355(a), 333(a)(1), (a)(2) (Introduction or Causing the Introduction of an Unapproved New Drug into Interstate Commerce); and 18 U.S.C. § 545 (Importing Merchandise Contrary to Law); 18 U.S.C. § 2(b) (Causing an Act to Be Done), namely:

i.  Information relating to who created, accessed, or used the SUBJECT ACCOUNT, including records about their identities and whereabouts.

ii.  Information related to the sale, offer for sale, purchase, order, importation, exportation, distribution, manufacture, and/or administration of any products containing Naltrexone and/or any prescription drug.

iii. Information related to the marketing and promotion of any products containing Naltrexone and/or any prescription drug.

iv.  With respect to any products containing Naltrexone and/or any prescription drug, all business journals and ledgers, purchase orders, shipping invoices, packing slips,

contracts, receipts, computer internet records, written and
electronic correspondence, bank records, including bank
statements, cancelled checks, check registers, other records
reflecting payments, credit card statements and receipts,
scanned handwritten notes, memoranda, address books, other
documents identifying suppliers and customers, and records of
purchase from suppliers and customers.

          v.    All correspondence related to the foregoing
requests.

         b.    All records and information described above in
Section II.10.b.

## IV.  PROVIDER PROCEDURES

    12.  IT IS ORDERED that the PROVIDER shall deliver the
information set forth in Section II within 10 days of the
service of this warrant.  The PROVIDER shall send such
information to:

         FDA Special Agent Michael Landon
         201 Avenida Fabricante, San Clemente, CA 92672
         (949) 940-4227
         Michael.Landon@fda.hhs.gov

    13.  IT IS FURTHER ORDERED that the PROVIDER shall provide
the name and contact information for all employees who conduct
the search and produce the records responsive to this warrant.

    14.  IT IS FURTHER ORDERED, pursuant to 18 U.S.C.
§ 2705(b), that the PROVIDER shall not notify any person,
including the subscriber(s) of each account identified in
Attachment A, of the existence of the warrant, until further
order of the Court, until written notice is provided by the

vi

United States Attorney's Office that nondisclosure is no longer
required, or until one year from the date the PROVIDER complies
with this warrant or such later date as may be set by the Court
upon application for an extension by the United States.  Upon
expiration of this order, at least ten business days prior to
disclosing the existence of the warrant, the PROVIDER shall
notify the agent identified in paragraph 12 above of its intent
to so notify